IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2022

**STATE OF TENNESSEE v. TERRY JAMES LEE**

**Appeal from the Circuit Court for Williamson County**
**No. I-CR-180523     Joseph Woodruff, Judge**

---

**No. M2021-01084-CCA-R3-CD**

---

Aggrieved of his Williamson County Circuit Court jury convictions of aggravated kidnapping, simple possession, violating the financial responsibility law, speeding, and the improper use of a vehicle registration, the defendant, Terry James Lee, appeals. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the admission of evidence of certain uncharged conduct, and the admission of certain of his pretrial statements to the police. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and KYLE A. HIXSON, JJ., joined.

Jonathan E. Richardson, Nashville, Tennessee, for the appellant, Terry James Lee.

Herbert H. Slatery III, Attorney General and Reporter; Katharine E. Decker, Assistant Attorney General; Kim R. Helper, District Attorney General; and Jessica N. Borne, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Williamson County Grand Jury charged the defendant, Terry James Lee, with aggravated kidnapping, domestic assault, simple possession, driving after having been declared a motor vehicle habitual offender, violating the financial responsibility law, speeding, and improper use of vehicle registration related to events that occurred on April 30 and May 1, 2018.

At the defendant's October 2020 trial, the victim[1] testified that she began a romantic relationship with the defendant after the two met on a "chat line" in 2017. The two met in person in November 2017 when the defendant visited her at her home in Quitman, Georgia. The victim ended the relationship in late March or early April 2018.

On the morning of April 30, 2018, Leroy Waters came to pick the victim up at the residence she shared with her daughter in Quitman. The victim, who did not drive, cleaned houses for a living, and one of her clients was Mr. Waters' mother, Joann. Mr. Waters stopped for gas and cigarettes, and the victim went inside the convenience store to purchase lottery tickets. Inside, the defendant approached the victim and asked if the two could talk. The victim "told him I didn't have nothing to talk about," but the defendant "kept talking about he wanted to talk to me, could he talk to me when I get down to Joann's. So I told him I don't know. I said, I'll see." The victim then left the store, and the defendant followed behind. Before the victim could reach Mr. Waters' car, the defendant "grabbed me from behind and was holding my face to keep me from screaming and hollering." The defendant forced the victim into the back seat of his waiting car, and she was unable to escape because "he had the safety lock on." Surveillance video exhibited to her testimony and played for the jury showed the defendant forcing her into the car and her fighting against him.

The defendant drove away from the store and immediately demanded that the victim surrender her cellular telephone. Initially, he told her that he would drive her "to Ms. Joann's, but he didn't." The defendant continued onto Interstate 75 in Valdosta and told the victim that he had "paid Leroy $250 to bring you up, so I could get you to ride with me to Tennessee" so the defendant could "pay on the car and put it in my name" despite that the victim did not drive and had never held a driver's license. The defendant stopped for gas after approximately two hours but warned the victim that he would kill her if she attempted to escape. He did not allow her to go inside to use the restroom and instead made her urinate "on the side of the road."

Eventually, the defendant drove them to a hotel, but they did not stay long because "some people came out with him and stuff, and he said, we gotta go because they're going to call the law." The victim said that she did not attempt to report the kidnapping to "the people" because she "was scared what he might do to me." When the pair shopped at a nearby Walmart, the defendant stayed near the victim the entire time. He did allow her to answer a telephone call from her daughter, whom she told she was "out of town," that she was with the defendant, and that the trip "was not my choice." She was afraid to say more.

---

[1]   To protect the anonymity of the victim, who was also sexually assaulted during the ordeal, we will not use her name in this opinion.

Later, they checked into another hotel, and the defendant "started questioning me about who I been with and all that. Then he punched me in my face." The defendant forced the victim to disrobe and then raped her. Afterwards, he drove the victim to various stores to purchase shoes, clothing, food, and medical supplies to treat the injury to her face. When they returned to the hotel, the defendant raped the victim a second time and placed her cellular telephone on the nightstand near his head to keep it from her.

On the following morning, the defendant drove to a roadside car dealership in Jackson, Tennessee, where "he paid the man some money for" a Pontiac and "told him he wanted to put it in my name." The defendant demanded that the victim sign paperwork prepared by the man at the car dealership. The defendant then drove "to some of his people's house" and then to the defendant's uncle's house to "get some dope and some . . . weed."[2] At each stop, the victim remained in the car, and the defendant stayed close by. The victim acknowledged smoking some of the marijuana while the defendant smoked some of the cocaine. She placed the remainder of the marijuana in the car's console. Thereafter, they drove to the defendant's mother's house, and the victim reported to the defendant's mother "that Terry Lee was being mean to me." The defendant's mother chastised him, and they left. The defendant returned the victim's cellular telephone and promised to drive her home.

As they drove, the victim began to doze and was nearly asleep when the defendant alerted her to the presence of a police car behind them. The victim told the defendant that she was "going to tell the police what you done did." At her first opportunity, "I said that he had kidnapped me." After police officers found marijuana in her purse, she was placed under arrest. At the jail, the victim told detectives all that had happened from the time that the defendant forced her into his car in Quitman. At the conclusion of the interview, officers transported the victim to the hospital where "[t]hey did a rape kit on me" and took photographs of the bruises and scratches on her face, arms, and legs.

During cross-examination, the victim acknowledged that she interacted with other people when she and the defendant shopped for clothing, shoes, food, and other necessities. She admitted that the defendant paid for all the items. She also acknowledged that she was with the defendant when he procured a new license plate for the Pontiac. During redirect examination, the victim said that she did not travel to any location with the defendant of her own volition.

---

[2]     The victim explained that "dope" was crack cocaine and that "weed" was marijuana.

Williamson County Sheriff's Office ("WCSO") Deputy Brian Welch was driving on eastbound Interstate 840 in Williamson County in his unmarked patrol car at approximately 5:00 p.m. on May 1, 2018, when he observed a black Pontiac G6 approaching from the rear "at a very high rate of speed." Deputy Welch, whose vehicle was not equipped with radar, began "pacing" the vehicle to determine its rate of speed. He paced the car for a total of six miles, during which time the vehicle reached a speed of 105 miles per hour and continued at that pace "for a length of distance." During that time, Deputy Welch learned that the license plate affixed to the black Pontiac actually belonged to a green Mercury Grand Marquis. Deputy Welch stopped the vehicle and approached the driver, who identified himself as Terry Lee. The defendant gave the officer "a Tennessee ID" but not a driver's license and told him "that he was trying to attempt to get to the hospital for his passenger because she was having stomach pains." Deputy Welch offered to call for an ambulance, but the victim, who was seated in the passenger seat, demurred.

Deputy Welch ran the identification provided by the defendant and learned that the defendant's driver's license had been revoked and that he had been declared a motor vehicle habitual offender. Deputy Welch placed the defendant under arrest and placed him in the rear of the patrol car. Around the same time, other officers arrived on the scene and interviewed the victim, who reported that the defendant had kidnapped her in Quitman, Georgia. Deputy Welch telephoned the Quitman Police Department, and, while he was on the telephone, the defendant knocked on the window of the deputy's vehicle. Deputy Welch "went back there to check on him," and the defendant told him that the victim "had marijuana on her" and that "if she told you I kidnapped her . . . , she was an F'ing liar." At that point, deputies searched the vehicle and discovered "three small bags of marijuana" inside "a little coin purse" in the victim's purse. Deputy Welch elected to transport both the defendant and the victim to the police station. While placing the victim into custody, Deputy Welch observed "two to three scratches that were about three to four inches long" under the victim's left eye.

On the following morning, a detective with the Quitman Police Department telephoned Deputy Welch to report that "they had watched videos and saw what happened." Deputy Welch then referred the case to the criminal investigation division.

WCSO Detective Darren Barnes interviewed the victim following her arrest and observed injuries to her person. After speaking with the victim, he and his partner interviewed the defendant, who told them that the victim had voluntarily traveled with him to Tennessee "to put a car in her name or register a car in her name that he had purchased." Detective Barnes watched the surveillance video from the store in Quitman and listened to a telephone call the defendant had placed from the Williamson County Jail. In the call, the defendant told "Mr. Waters to stick with their story, that the victim . . . couldn't afford to come back to Tennessee. So I think it was his opinion that the charges would, ultimately,

-4-

just be dismissed." The defendant also told Mr. Waters that he had "dope" in the Pontiac that the police had failed to discover during their initial search.

Detective Barnes interviewed the defendant a second time after listening to and viewing the recordings. Following that interview, the detective assisted in a search of the defendant's car, during which search officers discovered a bag of what officers believed to be crack cocaine "in a cup that was in a cup holder in the center of the vehicle." The substance was sent to the Tennessee Bureau of Investigation ("TBI") for testing. Officers also discovered first aid supplies, including alcohol, peroxide, and Neosporin; a temporary tag for the Pontiac that had expired on December 3, 2017; and a number of shopping bags and receipts reflecting the various purchases described by the victim.

Detective Barnes also listened to a second telephone call placed by the defendant to Mr. Waters following the second interview. The audio recording of that call was exhibited to his testimony and played for the jury. Additionally, Detective Barnes obtained the medical records from the victim's visit to the emergency room on May 1, 2018. The records, which were exhibited to his testimony, established that the victim's blood tested positive for the presence of marijuana and negative for the presence of cocaine. The records also indicated that a rape kit had been performed on the victim.

WCSO Investigator John Pierce participated in the search of the defendant's vehicle and provided the defendant with a copy of the search warrant return, which included an inventory of all the items collected. After receiving the document, the defendant asked to speak to Sergeant Amy Cole. Investigator Pierce joined Sergeant Cole in interviewing the defendant, and a recording of the interview was exhibited to his testimony and played for the jury.

TBI Special Agent and Forensic Scientist Rebecca Hernandez testified as an expert in forensic chemistry that the substance she received from the WCSO and marked with the defendant's case number was "[c]ocaine base in the amount of 8.02 grams."

TBI Special Agent and Forensic Scientist Heather Lenzy testified as an expert in forensic biology that she subjected the cervical swabs taken from the victim to forensic testing. Her testing "confirmed the presence of sperm" on the victim's cervical swab, and DNA testing established that the defendant was the "major contributor." She said that the amount of sperm on the cervical swab suggested that the defendant had had sex with the victim sometime between 72 hours and one week before the swab was taken.

The defendant testified that in April 2018, he and the victim "was supposed to been going together" although the victim "was telling other people that we wasn't." According to the defendant, the couple had to be discreet because the victim was still

married when they began dating. The defendant claimed that he supported the victim. He said that at the time, he and the victim lived with the victim's uncle and that he paid the victim's uncle "$200 for the rent. . . . $100 for her and $100 for me. So even if she wasn't there, I was still paying the $200." He claimed that he and the victim had previously discussed traveling to Tennessee to "put the car up into her name and her meet my mother." The defendant claimed that he intended to give the car to the victim "to help her" because "she didn't have nothing" and "[w]as on drugs bad and prostituting, and all that there."

The defendant testified that on April 30, 2018, he enlisted Mr. Waters to arrange his meeting with the victim "[a]t the store" so that they could begin their trip to Tennessee. He claimed that he could not meet the victim at her home because the victim's daughter believed that the defendant "had called in to the DHS office" and "told them about that supposedly that [the victim] was supposed to been playing with her son's middle section in the bathtub." The defendant said that when he first encountered the victim at the store, she confronted him about "this girl that you supposed to gave $200 to let her show you her middle section." The two continued "conversing" as they walked into the parking lot and he "pushed her towards my car. You know, went around to my back door opened it." He insisted that the victim wanted "to get in front" but that he told her to get into the back seat because "we had all this stuff in the front seat." The defendant claimed that "the commotion started" when "I snatched her money from her" because he wanted to know what she had done "with the $500, the rest of the money, the $500 I gave her?"

The defendant testified that after leaving the store, he and the victim traveled to the victim's uncle's house to "get some clothes," adding that the clothing "should still be in the back of the trunk of the car right now. They ain't moved them, like that there. She got a lot of them, more belongings in the car." From there, they traveled to Valdosta and then onto the interstate towards Tennessee. They stopped for gas, food, and other things along the way, with the victim returning each time to the car voluntarily. The defendant said that they stopped at a hotel in Atlanta but had to leave after he got into an argument with "the albino" working at the front desk over the cost of the room. From there, they went to Hardee's and then to a convenience store in Chattanooga where the victim purchased "another beer and some lottery tickets" and a hat that said "Happy Mother's Day." Later, they checked into a motel where the defendant read and then went to sleep while the victim stayed up "messing with the TV," "drinking[,] and smoking weed." During the evening, the victim spoke with her daughter on the telephone and told her that she would not be returning that evening because "it's time for me to have my fun and do what I need to do for myself sometimes."

On the following morning, the victim "dyed my hair for me" "because, she said, I don't like the way it looked with all that gray hair." After they got showered and dressed for the day, the defendant and the victim drove to the car lot in Trenton, Tennessee.

The defendant and the victim went inside the dealership to sign the papers transferring the title of the Pontiac to the victim. They then traveled to the defendant's mother's house, where the victim jumped out of the still moving car, so excited was she to meet the defendant's mother. She hugged the defendant's mother and wanted to stay for dinner, but the defendant told her that they had to leave to make it to the courthouse in time to register the car. At the courthouse, the victim signed the necessary paperwork, the defendant paid the clerk, and the clerk gave the license plate to the victim.

After leaving the courthouse, the defendant and the victim traveled to visit first the defendant's friend, then the defendant's nephew who "got shot 12 times, you know, with a nine-millimeter, he's paralyzed," and then to the defendant's uncle's house. There, the victim purchased four bags of marijuana for $40 with money given to her by the defendant. The defendant testified that he then told the victim that they "need[ed] to be heading out" so that she could "be back tomorrow" and "I ain't going to be doing no speeding." The defendant said that he had to return to Quitman "because I had to be in court in Quitman on that Thursday."

The defendant said that he first observed Deputy Welch "right there at 840" and that "we trailed behind him until we got all the way into Dickson," where the defendant began to pass the deputy, who "was driving slow," "running . . . about 55 or 60, just like that" in "a 70-mile-an-hour zone." At that point, Deputy Welch sped up, so the defendant "got back in behind him, and then he slowed down again. So when I pulled out the second time, you know, he speeded up again. You know, so, I got down hard on mine, so he got down hard on his." The defendant "passed him and got in front of him," and "that's when I noticed it was a police." The defendant insisted that Deputy Welch "lied on this paper saying I was running 105 miles an hour," insisting that the car "is governed down" and explaining that "[y]ou get up to 75, it ain't going to go no more. It would be like it was trying to flood out." The defendant said that a mechanic had previously explained that the car was equipped with a governor.

The defendant testified that he admitted to Deputy Welch that his driver's license had been suspended and that he "gave him my social security card," which was also "my Tennessee ID." He said that while the deputy was checking his identification, the victim busied herself by hiding the marijuana inside her "coin purse." The defendant stated that the deputy ordered him out of the car and placed him in handcuffs but specifically told him that he was not under arrest. He insisted that the victim "made up this story after they found the weed, that she was kidnapped." The defendant denied knocking on the window to get the deputy's attention, saying that he could not reach the window because his hands were handcuffed behind his back.

-7-

During cross-examination, the defendant denied telling Detective Barnes that he knew that the victim did not want to be with him, despite that the recording of his interview with Detective Barnes included that proclamation. He also denied that the victim was in the process of seeking a restraining order against him in Quitman, Georgia, and that he had been charged with domestic assault in Quitman. He admitted that he had been charged with simple assault involving the victim and her son. The defendant said that at the time of the assault, during which he had been armed with a knife, he was living with the victim's uncle but that she had moved out "to get to go do them drugs." He added, "And she know I ain't going to let it happen." He then admitted that he had purchased marijuana for the victim when they were in Trenton because "she wanted to enjoy herself" so "I went on and done that for her. Yeah, of course I did." The defendant testified that the victim also smoked crack cocaine and admitted that he "smoked some, too."

When asked whether the victim "got in that vehicle on her own[,]" the defendant replied, "You know, in some ways it was on her own. But when the discussion came of me pushing her back, is when she was trying to get that money when she bit my hand . . . . that's how them scratches got there on her face." He denied forcing the victim into his car but admitted that "the video showed that I was back there scuffling with her in the car." The defendant acknowledged that he told Mr. Waters "to stick to the story, because I know he's slow, and you know people get convincing him, he -- he'll say something else. But that was the truth." He conceded that he "paid Leroy the money, yeah, to pick her up."

The defendant denied telling the detective that he knew that the victim was scared of him but admitted that he overheard the victim tell his mother that he had been mean to her, explaining that "what she meant by that" was the defendant's refusal to allow the victim to "smoke dope" and his insistence that she "get up and go outside." The defendant acknowledged that he told the detective that he had not had sex with the victim for "a month or two" and insisted Special Agent Lenzy was not "truthful" when she testified that her testing established that the defendant and the victim had had sex much more recently than "a month or two." The defendant denied ever striking the victim. He maintained that "Deputy Welch, he lied too many times to these questions" to be believed.

Mary Ann Blakely, the defendant's mother, testified that the defendant and the victim visited her Trenton, Tennessee home on May 1, 2018, "pretty close to the noon day." Ms. Blakely said that the victim "didn't act like nobody that had been kidnapped. She was laughing and going on just like a woman would." Ms. Blakely insisted that she "wouldn't take up for" the defendant and "wouldn't sit up here and lie for him . . . if he was in the wrong."

-8-

During cross-examination, Ms. Blakely insisted that the victim "ain't told me nothing about he'd been no mean. She's told me nothing about he had been mean to her." Ms. Blakely also testified that the victim had no visible injuries the day that she visited Ms. Blakely.

Raymond Spinks, Jr., the defendant's cousin, testified that he spoke with the defendant by telephone on either April 30 or May 1, 2018, and that the defendant "told me, that him and [the victim] was headed to my auntie's house" and that he was going to repay Mr. Spinks the money that Mr. Spinks had lent the defendant for repairs to his car. Mr. Spinks said that the defendant referred to the car as "him and [the victim's] car." Mr. Spinks understood the defendant and the victim to be involved in a romantic relationship at that time.

Based upon this evidence, the jury convicted the defendant as charged of aggravated kidnapping, simple possession, speeding, violating the financial responsibility law, and the improper use of a vehicle registration.[3] Following a sentencing hearing, the trial court imposed a Range II total effective sentence of 20 years' incarceration. The defendant filed a timely but unsuccessful motion for new trial and a timely notice of appeal.

In this appeal, the defendant asserts that the trial court lacked territorial jurisdiction over the kidnapping of the victim because all the elements of the offense occurred outside Williamson County, that the trial court committed plain error by permitting the introduction "of non-charged rape evidence" that occurred "outside of the county" in violation of Tennessee Rule of Evidence 412, and that the trial court should have suppressed his pretrial statement to the police.

## I. Jurisdiction, Venue, and Sufficiency

The defendant's claim is, to put it mildly, convoluted, drifting into issues of probable cause for the traffic stop,[4] the voluntariness of the defendant's statement to Deputy Welch during the traffic stop,[5] and the application of "the rules of frolic and detour."[6] He asserts that "the main criminal activity" involved both began and ended in

---

[3] The State dismissed the charge of driving after having been declared a motor vehicle habitual offender.

[4] The defendant's traveling more than 30 miles per hour in excess of the speed limit provided Deputy Welch with probable cause to stop the vehicle and the defendant's lack of a valid driver's license provided probable cause for his arrest. *See* T.C.A. § 55-8-152(c).

[5] The defendant does not mount a true challenge here to the admissibility of his statement, which, as the trial court astutely concluded, was a spontaneous utterance and not the product of custodial interrogation.

[6] Obviously, "the rules of frolic and detour" have no application in this case. The concepts of "frolic"

Quitman, Georgia and that, although it is well-settled that kidnapping is a continuing offense, "none of the elements of [a]ggravated [k]idnapping were present at the time of the alleged traffic stop in Williamson County." The defendant also challenges the sufficiency of the convicting evidence by suggesting that at the time of the stop, the victim "had her full liberty," noting specifically "the consensual and free ride the couple took during the shopping spree, drinking, drug use, sex, and trip back to Georgia." Thus, he asserts, the offense had ended before they entered the court's jurisdiction.

"It is elementary that before a court may exercise judicial power to hear and determine a criminal prosecution, that court must possess three types of jurisdiction: jurisdiction over the defendant, jurisdiction over the alleged crime, and territorial jurisdiction." *State v. Legg*, 9 S.W.3d 111, 114 (Tenn. 1999). "[T]erritorial jurisdiction, which recognizes the power of a state to punish criminal conduct occurring within its borders, is embodied in the constitutional right to a trial 'by an impartial jury of the county in which the crime shall have been committed[]'" and "reflects that '[a] state's criminal law is of no force and effect beyond its territorial limits.'" *Id.* (citations omitted). Territorial jurisdiction will lie in this state "when an offense is continuing in nature and has continued into Tennessee from another state . . . so long as any essential element to the offense continues to be present in Tennessee." *Id.* at 116. Whether the State has established territorial jurisdiction is a question of fact to be determined by the jury beyond a reasonable doubt. *See State v. Beall*, 729 S.W.2d 270, 271 (Tenn. Crim. App. 1986).

Venue—not to be confused with territorial jurisdiction—refers to the fact that offenses generally must be tried in the county where the offenses were committed. *See* Tenn. Const. art. 1, § 9 (stating that "in all criminal prosecutions, the accused hath the right to . . . a speedy public trial, by an impartial jury of the County in which the crime shall have been committed"); *see also* Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." *State v. Hutcherson*, 790 S.W.2d 532, 535 (Tenn. 1990); *see also* T.C.A. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Venue is a question of fact to be determined by the jury, which may "draw reasonable inferences from the evidence" and may make its determination based solely upon circumstantial evidence. *State v. Young*, 196 S.W.3d 85, 101, 102 (Tenn. 2006).

---

and "detour" are antiquated labels affixed to the distinction between acts falling within the scope of employment and those falling without for the purpose of determining vicarious liability and compensability in workers' compensation cases.

-10-

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the trier-of-fact resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a]ggravated kidnapping is false imprisonment, as defined in § 39-13-302, . . . [w]here the victim suffers bodily injury." T.C.A. § 39-13-304(a)(4). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." *Id.* § 39-11-106(a)(3). Because "[t]he offense of false imprisonment was clearly intended to punish a continuing course of conduct," our supreme court has determined that "an act of removal or confinement does not end merely upon the initial restraint, and a defendant continues to commit the crime at every moment the victim's liberty is taken." *Legg*, 9 S.W.3d at 117. "Because aggravated kidnapping is a continuing offense, the State needed only to show that at least one element of the crime continued into Tennessee for territorial jurisdiction to properly attach." *Id.* at 118.

The State easily met its burden in this case. Minutes into Deputy Welch's stop of the defendant's car, the victim reported that she had been kidnapped and was being held against her will. The defendant's spontaneous declaration, made without the benefit of the victim's revelation to the officers, "that if she told you I kidnapped . . . her, she was an F'ing liar" suggests the defendant's guilty knowledge. To be sure, the defendant and the victim made any number of stops during their foray into the State, but the victim's testimony established that the defendant remained close to her during each stop. She testified that she feared the defendant because he had physically assaulted, raped, and threatened to kill her. Additionally, the victim did not drive, had no driver's license, had no money, and, indeed, had no real idea of her own location throughout the ordeal. Photographs of the victim depicted scratches and bruises to her face and body. This evidence was sufficient to support the defendant's convictions and to establish that, despite that the original removal occurred in Georgia, both territorial jurisdiction and venue lay in Williamson County.

## II. Tennessee Rule of Evidence 412

The defendant next asserts that the trial court committed plain error by permitting "the introduction of non-charged rape evidence at trial" in violation of Tennessee Rule of Criminal Procedure 12 and Tennessee Rule of Evidence 412, arguing that the State failed to provide him with notice as required. He also challenges Special Agent Lenzy's qualifications to testify as an expert. Finally, the defendant circles back to his earlier arguments regarding territorial jurisdiction and venue, arguing that the trial court erred by admitting evidence of the rape because the victim was raped outside of Williamson County. The State contends that the defendant has waived plenary review of the admission of this evidence and that he cannot satisfy the requirements for plain error review because the trial court did not err by admitting the evidence.

We agree with the State that the defendant has waived plenary review of the admission of evidence that he raped the victim during the time that he held her against her will. Despite that the record clearly establishes that the defendant was aware well in advance of trial that the State intended to offer evidence of the rape and specifically intended to offer forensic evidence to establish the rape, the defendant did not move to exclude the evidence. The defendant did not object to the victim's testimony about the rape at trial. He also failed to challenge Special Agent Lenzy's qualifications or her testimony about the results of her forensic testing; he did object to the admission of Special Agent Lenzy's final report on hearsay grounds. The defendant's failure to make contemporaneous challenges results in waiver on appeal. *See State v. Bristol*, No. M2019-00531-SC-R11-CD, 2022 WL 5295777, at *4, ___ S.W.3d ___ (Tenn. 2022) (reiterating that "[i]t has long been the general rule that questions not raised in the trial court will not be entertained on appeal" (alteration in original) (quoting *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (other citations omitted)).

Whether properly assigned or not, this court may, "[w]hen necessary to do substantial justice, . . . consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial." Tenn. R. App. P. 36(b). This court will grant relief for plain error only when:

> the record clearly establishes what occurred in the trial court;
> (2) the error breached a clear and unequivocal rule of law; (3)
> the error adversely affected a substantial right of the
> complaining party; (4) the error was not waived for tactical
> purposes; and (5) substantial justice is at stake; that is, the error
> was so significant that it "probably changed the outcome of the
> trial."

-12-

*State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010) (quoting *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000)). The party claiming plain error bears the burden of satisfying all five criteria as a prerequisite to plain error review. *See id.* Because each factor must be established, we need not consider all five factors when a single factor indicates that relief is not warranted. *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "[A]n error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *Fayne*, 451 S.W.3d at 372 (citation omitted) (alterations in *Fayne*).

The defendant cannot avail himself of plain error review because he has failed to establish that a clear and unequivocal rule of law was breached.

As to the alleged violation of Tennessee Rule of Criminal Procedure 12(d), that rule permits but does not require the State to "notify the defendant of its intent to use specified evidence at trial in order to afford the defendant an opportunity to object before trial under Rule 12(b)(2)(C)." Tenn. R. Crim. P. 12(d)(1). As indicated above, the defendant was fully aware that the State intended to use evidence of the rape, including the results of forensic testing on the rape kit, well in advance of trial.

As to Special Agent Lenzy's qualifications, Tennessee Rule of Evidence 702 provides for the admissibility of "scientific, technical, or other specialized knowledge" that "will substantially assist the trier of fact to understand the evidence or to determine a fact in issue" by "a witness qualified as an expert by knowledge, skill, experience, training, or education." Tenn. R. Evid. 702. Generally, the admissibility of expert testimony is a matter entrusted to the sound discretion of the trial court, and there can be no reversal on appeal absent clear abuse of that discretion. *See State v. Scott*, 275 S.W.3d 395, 404 (Tenn. 2009); *State v. Copeland*, 226 S.W.3d 287, 301 (Tenn. 2007). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *Scott*, 275 S.W.3d at 404 (citing *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008)). Special Agent Lenzy testified as an expert in forensic biology based upon her education, training, and experience in that field. Given the opportunity to voir dire the agent about her qualifications, the defendant specifically agreed that her education and experience were sufficient to qualify her as an expert in the field. Moreover, Special Agent Lenzy's testimony about her education and experience as well as her curriculum vitae, which was exhibited to her testimony, established that she was eminently qualified to offer her expert opinion.

As to the alleged violation of Tennessee Rule of Evidence 412, that rule is limited to "a criminal trial, preliminary hearing, deposition, or other proceeding in which a person is accused of" certain sexual offenses and places limitations on the type of evidence that may be offered by the defendant about the victim's sexual history. Tenn. R. Evid. 412. Consequently, that rule has no application at all to this case and certainly does not impact the evidence offered by either the victim or Special Agent Lenzy.

As to the allegation that the trial court erred by admitting the evidence because the rape occurred outside of Williamson County, no rule of law or evidence prohibits the admission of evidence of uncharged conduct solely on the basis that the conduct occurred outside the jurisdiction of the trial court. Moreover, as indicated above, kidnapping is a continuing offense, and the evidence established that the rapes occurred while the defendant held the victim against her will and that the victim sustained bodily injury during the rape, bodily injury being an element of the aggravated kidnapping alleged in this case.

### III. Traffic Stop

In his final claim for relief, the defendant contends that the trial court should have granted his motion to dismiss the speeding charge and suppress the evidence obtained during the traffic stop, specifically his statement to Deputy Welch, because Deputy Welch lacked probable cause to stop his vehicle. He also argues that the trial court should have suppressed his statement on grounds that his arrest was illegal[7] and that the deputy failed to provide the defendant with *Miranda* warnings. The State asserts that the defendant has failed to preserve these issues for review by failing to raise them in his motion for new trial.

As the State correctly points out, the defendant did not raise the denial of any pretrial motion as a ground for relief in his motion for new trial, and, accordingly, has waived plenary review of any issue related to the denial of his motion to suppress. *See* Tenn. R. App. P. 3 ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). Although it is technically correct that the defendant cannot waive plenary review of any issue for which the remedy is dismissal of the charge, it is clear that

---

[7] "[T]he law is settled in this State that there is no constitutional immunity from an unlawful arrest," *Nelson v. State*, 470 S.W.2d 32, 33 (Tenn. Crim. App. 1971), and the only "remedy in the criminal justice arena for an illegal arrest is suppression of any evidence obtained as a direct or indirect result of the arrest," *State v. Baker*, 966 S.W.2d 429, 432 (Tenn. Crim. App. 1997).

the defendant's challenge to his speeding conviction is not a challenge to the sufficiency of the evidence but a challenge to the probable cause for the traffic stop. Consequently, our review is limited to plain error. *See* Tenn. R. App. P. 36(b).

The defendant, again, cannot avail himself of plain error review because the record does not establish that a clear and unequivocal rule of law was breached. Additionally, the record does not establish that any alleged error adversely affected any substantial right of the defendant.

Deputy Welch testified that he paced the defendant's car and placed his speed at 105 miles per hour in a 70-miles-per-hour speed zone. As he paced the car, he learned that the license plate affixed to the defendant's car was not registered to that car. The trial court and the jury accredited the deputy's testimony. The defendant's excessive speed and improper registration provided the deputy with probable cause to stop the vehicle. *See State v. Davis*, 484 S.W.3d 138, 143 (Tenn. 2016) ("Probable cause exists when 'at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense.'") (citations omitted); T.C.A. §§ 55-8-152; -5-115. Upon examining the identification provided by the defendant, Deputy Welch discovered that the defendant did not possess a valid driver's license and that he had been deemed a motor vehicle habitual offender. Consequently, the deputy had probable cause to arrest the defendant. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause."). To be sure, Deputy Welch did not provide *Miranda* warnings to the defendant, but he did not subject the defendant to an interrogation at the roadside. *See Miranda v. Arizona*, 384 U.S. at 436, 444 (defining "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way"). Instead, he placed the defendant in the back of his unmarked police vehicle and continued to investigate. While in the back of the vehicle, the defendant knocked on the window to get the deputy's attention and voluntarily offered that the victim "had marijuana on her" and "that if she told you I kidnapped . . . her, she was an F'ing liar." "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Id.* at 478.

## Conclusion

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE